**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**JAMES HOOVER, individually and on behalf of
all others similarly situated; KIMBERLY HOOVER,
individually and on behalf of all others similarly
situated; DAVID MINCEL, individually and on
behalf of all others similarly situated,**

                **Plaintiffs,**

  **vs.**

**HSBC MORTGAGE CORPORATION (USA);
HSBC BANK USA, N.A.; ASSURANT, INC.;
AMERICAN SECURITY INSURANCE
COMPANY,**

                **Defendants.**

_____

**3:13-cv-149**
**(MAD/DEP)**

**APPEARANCES:**                    **OF COUNSEL:**

**BERGER & MONTAGUE, P.C.**      **SHANON J. CARSON, ESQ.**
1622 Locust Street                **PATRICK F. MADDEN, ESQ.**
Philadelphia, Pennsylvania 19103
Attorneys for Plaintiffs

**HOLLAND, GROVE,**            **ERIC D. HOLLAND, ESQ.**
**SCHNELLER & STOLZE, LLC**     **GERARD B. SCHNELLER, ESQ.**
300 North Tucker Blvd., Suite 801
St. Louis, Missouri 63101
Attorneys for Plaintiffs

**CATES MAHONEY, LLC**          **DAVID I. CATES, ESQ.**
216 West Pointe Drive, Suite A
Swansea, Illinois 62226
Attorneys for Plaintiffs

**LEVIN FISHBEIN SEDRAN & BERMAN**   **CHARLES E. SCHAFFER, ESQ.**
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Attorneys for Plaintiffs

**STROOCK & STROOCK & LAVAN LLP**
2029 Century Park East
Los Angeles, California 90067
Attorneys for Defendants,
HSBC Mortgage Corporation (USA)
and HSBC Bank USA, N.A.

**JULIA B. STRICKLAND, ESQ.**
**LISA M. SIMONETTI, ESQ.**

**HANCOCK ESTABROOK LLP**
100 Madison Street, Suite 1500
Syracuse, New York 13202
Attorneys for Defendants,
HSBC Mortgage Corporation (USA) and
HSBC Bank USA, N.A.

**DANIEL B. BERMAN, ESQ.**

**CARLTON FIELDS JORDEN BURT, LLP**
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC 20007-0805
Attorneys for Defendants, Assurant, Inc.
and American Security Insurance Company

**FRANK G. BURT, ESQ.**
**W. GLEN MERTEN, ESQ.**
**BRIAN P. PERRYMAN, ESQ.**

**GREENBURG TRAURIG LLP**
54 State Street, 6th Floor
Albany, New York 12207
Attorneys for Defendants, Assurant, Inc.
and American Security Insurance Company

**CYNTHIA E. NEIDL, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On February 8, 2013, Plaintiffs commenced this putative class action alleging that

Defendants engaged in a scheme to generate fees and income for themselves by requiring

mortgagees to purchase flood insurance for amounts and time periods not required under their loan

agreements and applicable law, and through improper commissions, kickbacks, and other benefits.

Plaintiffs seek injunctive relief, declaratory judgments, monetary damages, and attorneys' fees and

costs. *See* Complaint, Dkt. No. 1 ("Compl."). Presently before the Court are Defendants' motions to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *See* Dkt. Nos. 34, 35. Plaintiffs have opposed the motions to dismiss. *See* Dkt. Nos. 38, 39.

## II. BACKGROUND[1]

This case is one of many similar cases brought in courts around the country challenging the practices of mortgage lenders and insurers who "force-place" or "lender-place" insurance on the residential properties of borrowers. Individuals who borrow money to fund the purchase of residential property are often required by their lender to obtain flood insurance and other property insurance on the real property securing the loan. When the borrower does not maintain the insurance, or does not maintain it in amounts required by the lender, the lender is authorized to purchase the insurance for the borrower. Plaintiffs here challenge the extent of the lender's authority to purchase flood insurance and the practices engaged in by the lenders and insurance companies in providing that insurance.

### A.    The Parties

Plaintiffs James A. Hoover and Kimberly M. Hoover (the "Hoovers") and David Mincel ("Mincel") are mortgagees residing in Owego, New York and Lancaster, New York, respectively. Compl. ¶¶ 9-10. Defendant HSBC Bank USA, N.A. ("HSBC Bank") is a national banking association headquartered in New York, New York. *Id.* ¶ 11. Defendant HSBC Mortgage Corporation (USA) ("HSBC Mortgage," and together with HSBC Bank, the "HSBC Defendants") is a subsidiary of HSBC Bank that operates as a residential mortgage lender, originator, and servicer, and is a Delaware corporation headquartered in Depew, New York. *Id.* ¶ 12. Defendant

---

[1] Plaintiffs' allegations are presumed to be true only for the purposes of this motion, and do not constitute findings of fact by the Court.

3

Assurant, Inc. ("Assurant") is a Delaware corporation headquartered in New York, New York, which offers force-placed or lender-placed insurance products through its Assurant Specialty Property operating segment. *Id.* ¶ 13. Defendant American Security Insurance Company ("ASIC," and together with Assurant, the "Assurant Defendants") is a Delaware corporation headquartered in Atlanta, Georgia, and is an indirectly wholly-owned subsidiary of Defendant Assurant. ASIC operates under the trade names Assurant Solutions and Assurant Specialty Property. ASIC contracts with the HSBC Defendants and their affiliates to provide force-place insurance, track loans in the HSBC Defendants' mortgage portfolio, and handle customer service duties related to force-placed insurance. *Id.* ¶ 14.

**B.** **Plaintiffs' Individual and Class Action Claims**

Plaintiffs allege, on behalf of themselves and as representatives of certain classes, that Defendants have harmed them in three ways in regards to the requirement under their respective mortgages that they purchase flood insurance: first, the HSBC Defendants required the Hoovers to purchase and maintain floor insurance in amounts greater than permitted under the mortgage ("excessive coverage"); second, Defendants engaged in an improper scheme of kickbacks, commissions, and other compensation as part of the HSBC Defendants' force-placement of flood insurance ("kickback"); and third, Defendants improperly backdated force-placed flood insurance policies to cover periods for which there was no risk of loss ("backdating"). *Id.* ¶¶ 1-5.

Plaintiffs allege the following six (6) causes of action individually and behalf of certain classes:

> Count 1. breach of contract and breach of the implied covenant of
> good faith and fair dealing (as to the HSBC Defendants);
> Count 2. unjust enrichment (as to all Defendants);
> Count 3. breach of fiduciary duty (as to the HSBC Defendants);
> Count 4. aiding and abetting a breach of fiduciary duty (as to the
> Assurant Defendants);

Count 5.  conversion (as to all Defendants); and
Count 6.  violation of the New York Deceptive Practices Act
("NYDPA") (as to all Defendants).

*Id.* ¶ 7.

The Hoovers assert their breach of contract and breach of implied covenant of good faith and fair dealing claim against the HSBC Defendants on behalf of an "Over-Insured Class," defined as follows:

> All persons with residential mortgage loans originated, acquired and/or serviced by any HSBC Defendant and who, within the applicable statutes of limitations, were forced by any HSBC Defendant to pay for flood insurance which exceeded the lesser of the following: (1) $250,000; (2) the replacement cost value of the property pledged as security for the loan; or (3) the total outstanding loan balance, but excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and employees.

*Id.* ¶ 68.

Both the Hoovers and Mincel assert their breach of contract and breach of implied covenant of good faith and fair dealing claim, their unjust enrichment claim, their breach of fiduciary duty claim, their aiding and abetting a breach of fiduciary claim, and conversion claim on behalf of a "Lender-Placed Class," defined as follows:  "All persons in the United States who were charged for lender-placed flood insurance by HSBC during the applicable limitations period."  *Id.* ¶ 69.

Finally, both the Hoovers and Mincel assert their NYDPA claim against the HSBC Defendants on behalf of a "New York Subclass," defined as follows:

> All persons in the Over-Insured Class or the Lender-Placed Class whose mortgage loan or line of credit with HSBC was secured by real property in the State of New York, and who were subject to HSBC's flood insurance requirements and/or had lender-placed insurance coverage purchased for their property by HSBC during the applicable limitations period.

*Id.* ¶ 70.

**C.      Factual Allegations**

**1.      The National Flood Insurance Program and Regulations**

Federal law requires that homeowners whose homes are located in areas deemed to be at high risk of flooding maintain certain levels of flood insurance on their home.  As Plaintiffs allege:

> The National Flood Insurance Act, 42 U.S.C. § 4001, *et seq.* ("NFIA"), requires lenders to ensure that flood insurance coverage is maintained on any improved property securing a loan or line of credit that falls within a Special Flood Hazard Area ("SFHA"). Under the NFIA, the amount of coverage must be at least equal to the *lesser* of: (1) the outstanding balance of the loan; (2) the maximum insurance coverage available through the NFIP, which is $250,000; or (3) the replacement cost of the property. *See* 42 U.S.C. § 4012a(b)(1).
>
> The Department of Housing and Urban Development ("HUD"), which operates the Federal Housing Administration ("FHA"), has also stated that flood insurance coverage on FHA Loans (such as Plaintiffs' loan here) need not exceed the outstanding principal balance of the loan. *See, e.g.*, http://www.hud.gov/offices/cpd/environment/review/floodinsurance. cfm (last visited July 20, 2012) ("Dollar Amount of Flood Insurance Coverage. For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan."); *accord*, 24 C.F.R. § 203.16a(c) ("flood insurance must be maintained . . . in an amount at least equal to . . . the outstanding balance of the mortgage").

*Id.* ¶¶ 17-18.

**2.      The Hoovers**

On May 2, 2007, the Hoovers obtained an FHA loan from HSBC Mortgage for $83,341.00, secured by a mortgage on their home.  Since the Hoovers' home is within a SFHA, their mortgage loan is subject to the requirements of the NFIA and, as a result, they must maintain flood insurance "in an amount at least equal to the outstanding principal balance of the loan or the maximum limit

of coverage made available under the Act, whichever is less." *Id.* ¶¶ 25, 28 (citing 42 U.S.C. §

4012a(b)(1)).


The relevant provision in the Hoovers' mortgage, as it pertains to the HSBC Defendants'

discretion to require flood insurance, is as follows:

> 4.  Fire, Flood and Other Hazard Insurance.  Borrower shall insure
> all improvements on the Property, whether now in existence or
> subsequently erected, against any hazards, casualties, and
> contingencies, including fire, for which Lender requires insurance.
> This insurance shall be maintained in the amounts and for the
> periods that Lender requires.  Borrower shall also insure all
> improvements on the Property, whether now in existence or
> subsequently erected, against loss by floods to the extent required by
> the Secretary.  All insurance shall be carried with companies
> approved by Lender.  The insurance policies and any renewals shall
> be held by Lender and shall include loss payable clauses in favor of,
> and in a form acceptable to, Lender. . . .

*Id.*, Exh. 1, ¶ 4 ("Paragraph 4").  The Hoovers' mortgage also grants the HSBC Defendants the

authority to purchase property insurance on the Hoovers' behalf:

> Lender may do and pay whatever is necessary to protect the value of
> the Property and Lender's rights in the Property, including payment
> of taxes, hazard insurance and other items mentioned in paragraph 2.

*Id.*, ¶ 7.

Upon originating their loan, the Hoovers obtained $85,000 in flood insurance.  Following a

lapse in their flood insurance coverage, HSBC Mortgage sent the Hoovers a letter on or about July

9, 2008, stating that "[a]s we did not receive evidence of continuing or replacement flood

insurance on your property, we are now providing you with an annual evidence of insurance."  The

letter included an evidence of insurance for a policy issued by ASIC with a coverage period from

May 2, 2008, through May 2, 2009 and a coverage amount of $85,000, which exceeded the unpaid

principal balance at that time.  HSBC Mortgage renewed this flood insurance policy for successive

years until March 16, 2012, when HSBC Bank informed the Hoovers that the force-placed flood insurance policy with ASIC has been cancelled effective February 24, 2012, because HSBC Bank had received evidence of replacement coverage. *Id.* ¶¶ 30-38.

### 3. Mincel

On June 29, 2010, Mincel obtained a mortgage from HSBC Mortgage for approximately $190,000, secured by a mortgage on his home. Mincel's home was not deemed to fall within a SFHA at closing, but HSBC Bank subsequently asserted that it did. *Id.* ¶¶ 40, 42.

The relevant provision in the Mincel mortgage, as it pertains to the HSBC Defendants' discretion to require flood insurance and its rights to force-place such insurance, is as follows:

> 5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance. I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. . . .
>
> If I fail to maintain any of the insurance coverage described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and

will be payable with such interest, upon notice from Lender to me requesting payment.

*Id.*, Exh. 7, ¶ 5 ("Paragraph 5").

HSBC Bank sent Mincel a letter on August 6, 2012, stating that it had force-placed a temporary flood insurance policy on his home. The letter included an insurance binder for a policy issued by ASIC with a coverage period from July 1, 2012, through August 13, 2012, and a coverage amount of $184,437.00. On August 24, 2012, HSBC Bank sent Mincel another letter stating that "[a]s we did not receive evidence of continuing or replacement flood insurance on your property, we are now providing you with an annual evidence of insurance." This letter included an evidence of insurance for a policy issued by ASIC with a coverage period from July 1, 2012, through July 1, 2013, and a coverage amount of $184,437.00. *Id.* ¶¶ 40-46.

### 4. Defendants' Conduct

#### a. Excessive Coverage

The Hoovers, individually and on behalf of the putative Over-Insured Class, contend that the HSBC Defendants improperly force-placed flood insurance on their home in an amount greater than permitted under their mortgage agreement. That is, "Paragraph 4 of Plaintiffs' mortgage states that they are obligated to 'insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary' of HUD." *Id.* ¶ 29. HUD, in turn, requires that flood insurance be maintained in an amount at least equal to the outstanding balance of the mortgage. Since the HSBC Defendants force-placed a flood insurance policy on the Hoovers' home with a coverage amount that exceeded the outstanding balance on the mortgage, the Hoovers argue, the HSBC Defendants breached the terms of the mortgage contract.

### b. Kickbacks

Both the Hoovers and Mincel, individually and on behalf of the Lender Placed Class and New York Subclass, allege that the HSBC Defendants and their affiliates received improper and undisclosed kickbacks or commissions from the Assurant Defendants on the flood insurance that was force-placed on them. Plaintiffs cite to several reported cases in related litigation filed in district courts around the country, as well as public deposition testimony and media reports relating to the force-placed insurance practices employed by the HSBC Defendants, the Assurant Defendants, and others in this industry. *See id.* ¶¶ 48-51. Specifically, Plaintiffs allege:

> Upon information and belief, HSBC has entered into agreements with the Assurant Defendants pursuant to which HSBC and/or its subsidiaries/affiliates: (a) receive a portion of the premiums for each force-placed insurance policy purchased for a borrower; (b) assume a portion of the force-placed insurance policies originally written by force-placed insurance providers without any real or commensurate transfer of risk; and/or (c) receive services in kind from the Assurant Defendants that amount to kickbacks. Upon information and belief, those arrangements are exclusive.

*Id.* ¶ 52; *see also id.* ¶¶ 39, 47.

Plaintiffs further allege that the Assurant Defendants provide insurance tracking services to HSBC, and that the cost of such services is included in the force-placed insurance premiums, thereby passing the cost of insurance tracking for HSBC's entire portfolio onto a small percentage of mortgagees on whom Defendants force-place insurance. *Id.* ¶ 53. In addition, the Assurant Defendants entered into agreements with the HSBC Defendants and their affiliates in which the Assurant Defendants purchased reinsurance from an HSBC affiliate. *Id.* ¶ 54. Plaintiffs contend that this practice of kickbacks and commissions in connection with force-placed flood insurance is inconsistent with the NFIA, is forbidden by HUD regulations, and has been the subject of an

investigation by the New York State Division of Financial Services ("NYSDFS") and other regulatory bodies. *Id.* ¶¶ 58-64.

### c. Backdating

The Complaint contains relatively limited allegations regarding Defendants' purported Backdating conduct. Mincel, individually and on behalf of the Lender Placed Class and New York Subclass, alleges that Defendants "improperly backdat[ed] flood insurance policies to cover period[s] for which there is no risk of loss (meaning that the force-placed insurance is worthless)." *Id.* ¶ 5. "[B]y backdating policies, the Assurant Defendants were able to collect substantial premiums for unnecessary and unusable property insurance coverage." *Id.* ¶ 102.

## III. DISCUSSION

### A. Legal Standards

When a party moves to dismiss a claim pursuant to Rule 12(b)(1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). For purposes of such a motion, "the allegations in the complaint are not controlling, . . . and only uncontroverted factual allegations are accepted as true . . . ." *Id.* (internal citations omitted). Both the movant and the pleader are permitted to use affidavits and other pleading materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "Furthermore, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Gunst v. Seaga*, No. 05 Civ. 2626, 2007 WL 1032265, *2 (S.D.N.Y. Mar. 30, 2007) (quoting *Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)); *see also State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir.

2007) (holding that, in a motion to dismiss for lack of subject matter jurisdiction, a court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits").

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case. *See Global Network Commc'ns v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006); *Patane v. Clark*, 508 F.3d 106, 111–12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *See Robinson v. Town of Kent*, No. 11 Civ. 2875, 2012 WL 3024766, at *3-4 (S.D.N.Y. July 24, 2012) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). When presented with a motion to dismiss under Rule 12(b)(6), the Court may consider documents that are attached to the complaint or incorporated in it by reference, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2000). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a

document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. AT & T Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *see also City of Roseville Emps' Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient facts "to sho[w] that the pleader is entitled to relief[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555, and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

## B. Analysis

### 1. The Filed Rate Doctrine

Defendants argue that all of Plaintiffs' claims are barred by the filed rate doctrine. *See* Dkt. No. 34-1 at 13-16 (arguing for dismissal pursuant to FRCP 12(b)(1)); Dkt. No. 35-10 at 13-14 (arguing for dismissal pursuant to FRCP 12(b)(6)). "Simply stated, the [filed rate] doctrine holds

that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). "[T]he [Supreme] Court has emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates." *Florida Mun. Power Agency v. Fla. Power & Light Co.*, 64 F.3d 614, 617 (11th Cir. 1995). "[T]he purpose of the doctrine is 'preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.'" *In re Enron Corp.*, 328 B.R. 75, 83 (Bankr. S.D.N.Y. 2005) (quoting *City of Cleveland v. FPC*, 525 F.2d 845, 854 (D.C. Cir. 1976)). District courts in the Second Circuit have applied the filed rate doctrine in the insurance context. *See, e.g.*, *Servedio v. State Farm Ins. Co.*, 889 F. Supp. 2d 450, 453 (E.D.N.Y. 2012); *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415 (S.D.N.Y. 2009), *aff'd*, 379 Fed. Appx. 30 (2d Cir. 2010).

Since the premiums paid by Plaintiffs are based on rates filed with the NYSDFS, the Assurant Defendants argue that the filed rate doctrine precludes Plaintiffs from showing that they suffered a legally cognizable injury as a result of having paid inflated flood insurance premiums. Thus, having suffered no injury, Plaintiffs lack standing and, therefore, the Court lacks subject matter jurisdiction. The HSBC Defendants contend that Plaintiffs' claims challenging the force-place flood insurance premiums are barred by the filed rate doctrine because Plaintiffs are simply not permitted to challenge a rate approved through a regulatory process. As a result, Plaintiffs fail to state a claim for relief.

As an initial matter, the Court must consider whether the filed rate doctrine is a challenge to this Court's subject matter jurisdiction over Plaintiffs' claims or a defense on the merits. The Assurant Defendants argue that the Court lacks subject matter jurisdiction over the case by virtue

of the filed rate doctrine, as other courts have found.  *See, e.g.*, *Morales v. Attorneys' Title Ins.*

*Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997) ("At the core of the filed rate doctrine is the

issue of standing.").  There is, however, persuasive case law which holds that the filed rate

doctrine is not a subject matter jurisdiction issue, but is rather a defense on the merits.  *See, e.g.*,

*Curtis v. Cenlar FSB*, No. 13 Civ. 3007, 2013 WL 5995582, *2 (S.D.N.Y. Nov. 12, 2013) ("the

defendants' [filed rate] argument[ is] not properly understood as [a] standing argument[] and this

motion will be decided under Rule 12(b)(6)")*; Hallie v. Wells Fargo Bank*, No. 2:12-cv-235, 2013

WL 1835708, *4 (N.D. Ind. May 1, 2013) (finding that defendants' filed rate doctrine argument

was not a challenge to subject matter jurisdiction because defendants could not challenge the

diversity of citizenship or amount in controversy requirements and could not identify a federal

statute that would deprive the district court of jurisdiction to hear challenges to the reasonableness

of a rate chargeable by an insurance company); *Roberts v. Wells Fargo Bank*, No. 4:12-cv-200,

2013 WL 1233268, *9 (S.D. Ga. Mar. 27, 2013) ("the Court finds it prudent to address the filed

rate doctrine in the context of a 12(b)(6) motion").  Particularly persuasive in this regard is the

analysis of the court in *Curtis v. Cenlar*.  There, the court found as follows:

> [Defendants] reason that because Curtis loses on the merits, he has
> not suffered any "cognizable injury that is traceable to the acts of the
> Assurant defendants and he lacks standing to sue them."  But this
> reasoning would allow any Rule 12(b)(6) motion to be restyled as a
> Rule 12(b)(1) standing motion.  While standing and merits questions
> frequently overlap, standing is fundamentally about the propriety of
> the individual litigating a claim irrespective of its legal merits, while
> a Rule 12(b)(6) inquiry is concerned with the legal merits of the
> claim itself.  *See generally Allen v. Wright*, 468 U.S. 737, 751 (1984)
> (defining the standing inquiry as  "to ascertain whether the particular
> plaintiff is entitled to an adjudication of the particular claims
> asserted.").  Here, the defendants are not contending that Curtis is
> the wrong individual to bring these legal claims; they are arguing
> that the claims are simply not legally cognizable.

*Curtis*, 2013 WL 5995582, at *2.

This Court agrees with the court in *Curtis* and others that have determined that a filed rate argument is a defense on the merits, rather than a challenge to subject matter jurisdiction. Nevertheless, both the HSBC and Assurant Defendants argue that, by virtue of the filed rate doctrine, Plaintiffs' complaint fails to state a claim for relief. Accordingly, the Court will next consider whether the filed rate doctrine warrants dismissal of Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6).

According to Plaintiffs, they "are not challenging the rates filed with, and approved by the State of New York or any other state. Rather, Plaintiffs challenge the method and criteria that the HSBC Defendants used to select their force-placed insurer in the first place, as well as Defendants' joint manipulation of the force-placement process, and the kickbacks that HSBC receives by virtue of its illegal scheme." Dkt. No. 39 at 13. There is a substantial body of case law which courts have found claims similar to those brought by Plaintiffs here sufficient to survive a motion to dismiss, to the extent Plaintiffs do not challenge the rates charged by Defendants (as opposed to challenges to allegedly improper conduct underlying the rates, such as kickbacks). *See Simpkins v. Wells Fargo Bank*, No. 12-cv-00768, 2013 WL 45101066, *14 (S.D. Ill. Aug. 26, 2013) ("plaintiffs are challenging the lawfulness and purpose of payments that [the bank] received in the form of commissions, kickbacks, or other financial benefits, pursuant to several alleged pre-arranged agreements designed to maximize profits for defendants" and thus "should not be barred under the filed rate doctrine from challenging conduct which is not otherwise addressed by a governing regulatory agency"); *Leghorn v. Wells Fargo Bank*, No. C-13-00708, 2013 WL 3064548, *20-21 (N.D. Cal. June 19, 2013) ("Because Plaintiffs are not challenging [the insurer's] rate in making their claim against [the bank], the filed-rate doctrine . . . [is] inapplicable. For similar reasons, the filed-rate doctrine . . . do[es] not bar the allegations against [the insurer].");

*Gallo v. PHH Mortgage Corp.*, 916 F. Supp. 2d 537, 544 (D.N.J. 2012) ("'the filed rate doctrine simply does not apply' in circumstances where plaintiffs 'challenge the defendant's allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered the conduct'") (quoting *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 765 (3d Cir. 2009)); *Ellsworth v. U.S. Bank*, 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("Just because the damages are based on increased costs incurred as a result of the alleged kickback scheme does not transform a challenge to conduct and practices into a challenge to the premiums."); *Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST, 2012 WL 7051318, *4 n.2 (N.D. Cal. Dec. 20, 2012) ("to the extent that Plaintiffs are challenging Defendants' conduct in force-placing unnecessary, duplicative, or backdated insurance, as well as damage to the equity of their property, Plaintiffs are not challenging a filed rate"); *Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST, 2012 WL 7071469, *13 (N.D. Cal. Dec. 20, 2012) (same); *Kunzelmann v. Wells Fargo Bank*, No. 9:11-cv-81373, 2012 WL 2003337, *3 (S.D. Fla. June 4, 2012) ("I find that in this case Plaintiff's claims are not barred by the filed rate doctrine because he is not challenging the rates filed by Defendants' insurers. Rather, Plaintiff challenges the manner in which Defendants select insurers, the manipulation of the force-placed insurance process, and the impermissible kickbacks that were included in the premiums."); *Wahl v. Am. Sec. Ins. Co.*, No. C 08-0555, 2010 WL 4509814, *3 (N.D. Cal. Nov. 1, 2010) (California filed rate defense was "limited to situations where a plaintiff challenged a charged rate as excessive per se, and effectively asked the Court to calculate an alternative rate it deemed more 'fair'"); *Abels v. JPMorgan Chase Bank*, 678 F. Supp. 2d 1273, 1277 (N.D. Cal. 2009) ("Plaintiffs are not complaining that they were charged an excessive insurance rate, they are complaining that the defendant bank acted unlawfully when it chose this particular insurance company and this particular rate."); *cf. Rothstein v. GMAC*

*Mortgage, LLC*, No. 12 Civ. 3412, 2013 WL 5437648, *9 (S.D.N.Y. Sept. 30, 2013) ("Defendants have provided no authority to support the contention that the Court can, should, or must grant 'per se reasonable' status to rates designed and approved for lenders when those rates are secondarily billed by the lenders to borrowers instead. . . . As such, Defendants are not entitled to dismissal of Plaintiffs['] claims against them on this basis[.]"). "This reasoning is persuasive. For example, if insurance were available from a number of carriers at different rates – all subject to filed-rates – the filed-rate doctrine would not protect a loan servicer who chooses a carrier and a policy with a rate higher than others simply to receive a kickback not available from other carriers." *Cannon v. Wells Fargo Bank*, 917 F. Supp. 2d 1025, 1038 (N.D. Cal. 2013). To the extent other courts have reached a different conclusion with respect to the filed rate doctrine in this context, those opinions are unpersuasive and not binding on this Court. *See, e.g.*, *Singleton v. Wells Fargo Bank*, No. 2:12CV216-NBB-SAA, 2013 WL 5423917 (N.D. Miss. Sept. 26, 2013) (holding that Mississippi state law filed rate doctrine barred the plaintiff's claims entirely); *Decambaliza v. QBE Holdings, Inc.*, No. 13-cv-286-bbc, 2013 WL 5777294, *8 (W.D. Wisc. Oct. 25, 2013) (finding that 'Plaintiff's challenges should be addressed by the Wisconsin Commissioner of Insurance, who is responsible for making sure that insurers do not earn unreasonably high profits in relation to the risk of loss or claim unreasonably high expenses in relation to the services they provide").

In addition, Defendants have provided no proof that the alleged kickback or commission agreements between the HSBC and Assurant Defendants were duly filed with the NYSDFS. In order for this Court to determine whether the flood insurance rates charged by the Defendants are 'per se reasonable," Defendants must proffer evidence demonstrating that the regulating agency considered and approved of these agreements. "Defendant, the party bearing the burden to show dismissal is warranted under this doctrine, has not presented any authority to demonstrate that such

pre-arranged side agreements [for commissions, reinsurance premiums, and other financial benefits alleged by Plaintiffs] are similarly filed with, approved by, or regulated and monitored in some way by a governing regulatory agency." *Gallo*, 916 F. Supp. 2d at 546; *see also Rothstein*, 2013 WL 5437648, at *8 (same)*; Simpkins*, 2013 WL 4510166, at *14 (same).  Thus, the Court is not in a position at this stage of the litigation to determine that the filed rate doctrine applies.  This determination is consistent with one of the purposes of the filed rate doctrine, which is "to insure that regulated companies charge only those rates *of which the agency has been made cognizant*." *In re Enron Corp.*, 328 B.R. at 83 (emphasis added).

Finally, the filed rate doctrine is unavailable as a defense to the HSBC Defendants in this litigation because they are not insurers subject to the relevant regulatory regime.  Since the HSBC Defendants are "not subject to the extensive administrative oversight that insurance companies are, applying the filed rate doctrine in this instance would not serve" the purposes of the filed rate doctrine.  *Abels*, 678 F. Supp. 2d at 1277; *see also Leghorn*, 2013 WL 3064548, at *20 (as to defendant bank, the plaintiff's challenge was not to the lawfulness of the insurer's rate, but to the bank's decision to choose that insurer to obtain a kickback and thus, such claims were not prohibited by the filed rate doctrine).

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) based upon the filed rate doctrine are denied.

### 2.        Article III Standing as to Assurant

Relying on affidavits submitted in support of its motion to dismiss, Assurant states that it is a publicly-traded holding company and not an insurance company, and that it did not have a contract with the HSBC Defendants.  Thus, Assurant argues, no causal connection exists between

Assurant and Plaintiffs' injury and, therefore, Plaintiffs lack standing to sue Assurant. *See* Dkt. No. 34-1 at 16-17.

Plaintiffs argue that the Court should not credit Assurant's self-serving affidavits or, in the alternative, that they should be allowed to depose Assurant's affiant. Plaintiffs also argue that they have sufficiently alleged injury traceable to Assurant. In addition, Plaintiffs refer the Court to a number of purportedly judicially noticeable documents to demonstrate that Assurant was substantially involved in the force-placement of insurance on Plaintiffs and in resolving an investigation into this practice by New York State regulators. *See* Dkt. No. 38 at 16-21.

Not surprisingly, the parties disagree over which documents the Court may appropriately consider in deciding Defendants' motion to dismiss. However, the Court need not resolve those disputes, because the Court finds the allegations with respect to Assurant's conduct to be sufficient to withstand a motion to dismiss. In *Simpkins v. Wells Fargo Bank,* the court found that the plaintiffs had sufficiently alleged injury traceable to Assurant based on substantially identical allegations to those interposed by Plaintiffs here:

> In the case before the Court, in their first amended complaint, the plaintiffs alleged an injury in fact against Assurant. Plaintiffs claim they were required to pay for force-placed insurance policies provided by Assurant or an insurance provider subsidiary of Assurant, that in turn paid a fee back to Wells Fargo for placing the insurance. Plaintiffs contend that their injury was in being charged rates that were significantly higher than their previous policies in order to provide the necessary funds for the "kick-back," and for insurance policies backdated for periods of time that was past and for which no loss had occurred.
>
> Additionally, plaintiffs claim the injury is traceable to Assurant. Plaintiffs allege that Assurant, acting with Wells Fargo, provided grossly overpriced homeowners insurance policies as force-placed insurance to Wells Fargo borrowers, and then paid commissions to Wells Fargo for the referral of business. Plaintiffs contend this arrangement establishes that their injury is directly traceable to

Assurant's conduct, and that Assurant was a substantial part of the "scheme" to defraud plaintiffs.

Lastly, plaintiffs' injury can be redressed by a favorable decision from the court. If plaintiffs prevail in their lawsuit, they may recover actual damages in the form of restitution and/or disgorgement of defendants' overcharged premium payments. Plaintiffs also seek an imposition of a constructive trust, attorneys' fees and costs, and a judgment that defendants must cease the activities described in their complaint. As plaintiffs have adequately alleged the requirements of Article III case-or-controversy standing, the Court denies Assurant's motion to dismiss based on lack of standing.

2013 WL 4510166, at *11.

Although the Court has found that Plaintiffs have adequately alleged standing with respect to Assurant at the motion to dismiss stage, the Court will permit Assurant to renew its motion at a later time once the factual record has been more fully developed. *See Holmes v. Bank of Am.*, No. 3:12-cv-00487, 2013 WL 2317722 (W.D.N.C. May 28, 2013) (adopting magistrate's report and recommendation denying defendant insurer's motion to dismiss for lack of standing and subject matter jurisdiction without prejudice to renew following jurisdictional discovery); *but cf. Cannon*, 917 F. Supp. 2d at 1032-33 (dismissing defendant Assurant on 12(b)(6) grounds for failure to state a claim without prejudice to seek leave to amend following discovery). Accordingly, Assurant's motion to dismiss for lack of subject matter jurisdiction is denied without prejudice to renew following jurisdictional discovery.

### 3. Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing

Under New York law, "to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide'" and where the contract is unambiguous, a court is "'required to give effect to the contract as written.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citations omitted).

It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (quotation and citation omitted), when the agreements are "read as a whole." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (quotation and citation omitted). Courts must avoid "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (citations omitted). When the parties' intent is clear – *i.e.*, unambiguous – the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272 (2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Id.* (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264 (2007)).

If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. *Id.* (describing contractual language as ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The Court must then turn to extrinsic

evidence to determine the parties' intent. *See State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985) (per curium). While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008).

The HSBC Defendants make the following arguments in support of their motion to dismiss Plaintiffs' breach of contract and breach of implied covenant of good faith and fair dealing claims: (a) Plaintiffs breached first by failing to obtain the required flood insurance; (b) the HSBC Defendants have not committed a breach because the Hoovers' mortgage unambiguously granted the HSBC Defendants discretion to require flood insurance in amounts greater than the minimums required by the Secretary of HUD; (c) Mincel has insufficiently pled his breach of contract claim by failing to point to a specific contract provision that was breached; and (d) the covenant of good faith and fair dealing claims fail because such a claim cannot conflict with the express terms of the contract and cannot impose independent obligations beyond the contract. *See* Dkt. No. 35-10 at 15-18.

### a.     Plaintiffs' Breaches

The HSBC Defendants argue, in cursory fashion, that because Plaintiffs were obligated to maintain flood insurance under their respective mortgage agreements, and failed to do so, their breach of contract claims fail as a matter of law. Plaintiffs respond that their failure to maintain flood insurance was specifically contemplated in their mortgage contracts, and that the force-placed insurance provisions provide a remedy for such failure. Thus, Plaintiffs argue, their failure to maintain flood insurance was not a material breach.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party

has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d. Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 (1974)). "[F]or a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" *Frank Felix Assocs. Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quoting *Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)). In other words, "[a] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Id.* (citing *Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 215 (2d Dept. 1984)). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch*, 500 F.3d at 186 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985 (2d Dept. 1983)).

As an initial matter, the Court is not persuaded that Plaintiffs breached their mortgage agreements or that such breaches were material. The fundamental purpose of a mortgage contract is to finance the purchase of real property, using that real property to secure the loan. Insurance requirements and escrow accounts are merely collateral to this purpose. *See Mortgage Electronic Registration Systems, Inc. v. Maniscalco*, 46 A.D.3d 1279, 1282 (3d Dept. 2007) (holding that breach of escrow agreement not substantial enough to defeat the purpose of the contract). Nevertheless, it would not be prudent at this stage of the litigation to decide as a matter of law, one way or the other, whether Plaintiffs' failure to maintain flood insurance was a material breach. That is a fact-intensive inquiry better resolved at summary judgment or trial. Accordingly, the HSBC Defendants' motion to dismiss on this basis is denied.

### b. The HSBC Defendants' Authority to Force-Place Flood Insurance

#### i. *The Hoovers' Excessive Coverage Claim*

The HSBC Defendants argue that Plaintiffs' breach of contract claims rests on an inaccurate interpretation of law. The HSBC Defendants contend that federal law and the terms of the Hoovers' mortgage contract unambiguously authorized the HSBC Defendants to force-place flood insurance on their property in excess of the outstanding balance of the mortgage. This is because the relevant federal regulations do not prohibit them from requiring such insurance. Plaintiffs respond that "[t]he relevant question is not what federal regulations allow, but what HUD requires, because Plaintiffs were contractually obligated to insure their property against loss by floods only to the extent required by HUD." Dkt. No. 39 at 17.

The Hoovers' mortgage agreement contains a set of standard clauses that are required by HUD regulations to be in every FHA-insured mortgage. The language at issue here has been examined by several courts across the country, including at least one Circuit Court of Appeals, with diverging results despite the uniform language. At this stage of the litigation, and in light of the fact that various courts have reached different conclusions regarding this same language, the Court finds that the Hoovers' mortgage is ambiguous as to the HSBC Defendants' authority to force-place insurance in the amounts complained of, and that the Hoovers' interpretation that HSBC's discretion is limited under federal law is reasonable as alleged.

Among those courts which have addressed this issue, the most extensive discussion was by the First Circuit Court of Appeals in *Kolbe v. BAC Home Loans Servicing, LP*, No. 11-2030, 2013 WL 5394192 (1st Cir. Sept. 27, 2013). In that case, the district court dismissed the plaintiff's breach of contract claims based upon its conclusion that the mortgage agreement unambiguously gave the defendant the right to choose the amount of flood insurance it required. The district court also found that the defendant's flood insurance requirement was reasonable, as it was based upon FEMA policy guidelines, and therefore dismissed the claim for breach of the covenant of good

faith and fair dealing. *Id.* at *4 (discussing *Kolbe v. BAC Home Loans Servicing, L.P.*, No. 11–10312, 2011 WL 3665394 (D. Mass. Aug. 18, 2011) ("*Kolbe I*")). Following appeal, a divided panel of the First Circuit reversed, with the panel majority holding that both parties' interpretations of the contract could be found reasonable by a trier of fact. The panel majority also found that the implied covenant claim could proceed either on the theory that the defendant intentionally breached the agreement, or that it demanded more insurance to earn more profit. *Id.* (discussing *Kolbe v. BAC Home Loans Servicing, L.P.*, 695 F.3d 111 (1st Cir. 2012) ("*Kolbe II*")). For reasons that were later sharply criticized in a dissenting opinion, the First Circuit thereafter granted rehearing en banc, and vacated the *Kolbe II* panel's decision. *Id.* ("*Kolbe III*"); *see also id.* at *35-36 (dissenting on the grounds that the grant of en banc review was "troublesome for it sends a message that this court will rehear a case and set aside a panel's well-reasoned decision whenever it is unhappy with the result or would have simply decided the case differently"). The en banc court divided evenly, three to three, resulting in an affirmance of the district court's dismissal of the complaint for failure to state a claim. *Id.* at *1 (citing *Savard v. Rhode Island*, 338 F.3d 23, 25 (1st Cir. 2003)).

The en banc "majority" in *Kolbe III* found "[t]hree interrelated strands of reasoning to support its conclusion[:]

> The first is straightforward application of the typical principles of
> contract interpretation. When interpreting a written contract, we look
> at text, context, and purpose to discover whether a proffered reading
> of the contract is reasonable. For contract language mandated by a
> federal regulation, this context includes the regulation and the
> federal policy underlying the regulatory scheme. As a purely textual
> matter, the Bank offers the most natural reading of the disputed
> language. Yet even if an argument exists that Kolbe's textual reading
> is plausible, context confirms that the Bank's reading is correct and
> Kolbe's reading is incorrect. As we will describe, particularly under
> our third strand of reasoning, Kolbe's reading would hinder federal
> housing policy and conflict with other guidance from the federal

government regarding flood insurance. Interpreting the text in context, as we would do with any contract, we conclude that the Bank's reading is correct.

Second, we apply special principles for interpreting uniform contract language. Covenant 4 is a uniform clause used in millions of mortgages nationwide by many different lenders, so we give it one uniform meaning rather than multiple inconsistent meanings. Extrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract. Instead, courts seek to determine the uniform meaning of the clause as a matter of law, a task appropriate for the motion to dismiss stage. Kolbe cannot avoid dismissal on the grounds that his specific understanding or the actions of the parties create an ambiguity.

Third, the fact that the Covenant was drafted and mandated by the United States requires that its meaning be that meant by the United States when it drafted the regulation. The role that the Covenant plays in an important regulatory scheme requires that result. The language of the Covenant was not drafted or negotiated by the parties and was not the result of give-and-take in the marketplace. Rather, it was created and mandated in order to further important federal policies. While on the Covenant's plain language and context, we think the meaning is clear, were there doubt, we would defer to the position articulated to us by the United States in its amicus brief; in this case, the United States' position reinforces our conclusion reached in applying the first two principles.

*Id.* at *1-2.

The *Kolbe III* en banc "majority" reasoned that the first two sentences of Paragraph 4 granted unfettered discretion to the lender to determine the amount of insurance "for any hazards," which necessarily included floods. "Although the third sentence also addresses flood insurance, it adds and *independent* requirement: that the borrower maintain HUD's minimum level of flood insurance in addition to the *lender's* minimum." Notwithstanding the fact that the original panel had found otherwise, and three of the six judges on the en banc court disagreed, the "majority" "conclude[d] that the Bank's reading of the text, is the only plausible reading in the relevant

context." *Id.* at *9.[2]  Other courts have adopted similar reasoning in reaching the same

conclusion. *See, e.g.*, *Feaz v. Wells Fargo Bank*, Civil Action No. 12-0350-DK-M, 2012 WL

6680301, *8 (S.D. Ala. Dec. 21, 2012) (adopting the reasoning of *Lacroix*, *infra*, and the dissent in

*Kolbe II* "in finding that the hazards provision in Plaintiff's mortgage agreement provides

Defendant the legal authority to require Feaz to obtain flood coverage in an amount that exceeds

the principal amount due under the contract"); *McKenzie v. Wells Fargo Home Mortgage, Inc.*,

No. C-11-04965, 2012 WL 5372120, *14-15 (N.D. Cal. Oct. 30, 2012) (concluding "that

McKenzie's deed of trust authorized Defendants to set the required level of flood insurance 'in the

amounts and for the period that Lender requires[,]'" and thus "Defendants did not breach the

contract by simply requiring coverage above the outstanding principal loan balance") (footnote

omitted); *LaCroix v. U.S. Bank*, Civil No. 1103236, 2012 WL 2357602, *4 (D. Minn. June 20,

2012) (holding that "'[t]he first two sentences [of the Hazard Provision] afford the insurer

discretion to determine the amount of hazard insurance that the mortgagor must maintain,' and 'the

third sentence merely specifies the required minimum coverage for flood insurance'") (quoting

*Kolbe v. BAC Home Loans Servicing, L.P.*, No. 11–10312, 2011 WL 3665394, *4 (D. Mass. Aug.

18, 2011));

    The *Kolbe III* en banc court's "minority" disagreed, finding the "majority's" holding to be

an

> extraordinary intervention into the contractual dealings of two
> private parties.  In effect, they conclude that a federal agency,
> through court intervention, may rewrite an agreement even though
> the agency is not a party to the deal, and has no role in its
> enforcement, simply because a different agreement would better
> serve the government's newly clarified priorities. There is no
> justification for such a wholesale abandonment of common law

---

[2]  In reaching this conclusion, the court considered policy arguments and other extrinsic
evidence submitted by the defendants and the United States as amicus curiae.

> contract principles by our colleagues. . . . Whatever the ultimate resolution of his contentions, Kolbe has done enough to defeat the Bank's motion to dismiss and, hence, is entitled to move forward with his case, including discovery.

*Id.* at *18-19.

The en banc "minority" found it problematic that the "majority's" "conclusion of non-ambiguity [wa]s procured by means of hindsight, with substantial weight given to the government's newly announced view and the policies offered to justify it." *Id.* at *19. Importantly, the en banc "minority" noted that "the government's effort now to dispel the confusion generated by its poorly drafted language cannot erase the ambiguity that confronted Kolbe and his lender when they signed their mortgage agreement." *Id.* Thus, "even if [the en banc "majority"] conceded the covenant's ambiguity, they would still refuse to allow Kolbe's lawsuit to proceed. They maintain that the government's newly offered construction of Paragraph 4 not only governs mortgage agreements entered into subsequent to the pronouncement, but also operates retroactively to supersede the shared understanding of private parties who previously entered into mortgages containing the flawed language." *Id.* at 20 (internal citation omitted).

In support of their opposition to the motion to dismiss, the Hoovers cite to a case decided in this district, *Casey v. Citibank*, in which breach of contract claims based upon identical language survived a motion to dismiss. There, the court held that

> this particular contract provision is susceptible to either interpretation. Making all reasonable inferences in the non-movant's favor, this provision addresses two different categories of insurance. The first two sentences address insurance required by the lender. The third sentence contemplates insurance required by the Secretary of HUD. Further, the use of the word 'also' in the third sentence indicates flood insurance is separately addressed. Finally, the phrase 'to the extent required' could be reasonably interpreted, as Casey alleges, to mean the borrower need only maintain the minimum amount of flood insurance required by HUD regulations.

*Casey v. Citibank*, 915 F. Supp. 2d 255, 262 (N.D.N.Y. 2013). Several other courts have reached this same conclusion. *See, e.g.*, *Morris v. Wells Fargo Bank*, No. 2:11cv474, 2012 WL 3929805, *7 (W.D. Pa. Sept. 7, 2012) ("'to the extent required by the Secretary' in the third sentence reasonably can be read to set a floor or ceiling on the amount of required flood insurance"); *Skansgaard v. Bank of Am.*, 896 F. Supp. 2d 944, 947 (W.D. Wash. 2011) ("The three sentences of the deed of trust are ambiguous as to whether the lender has discretion to require any amount of flood insurance it requires."); *Wulf v. Bank of Am.*, 798 F. Supp. 2d 586, 588-89 (E.D. Pa. 2011) (adopting magistrate judge's report and recommendation that defendants' motion to dismiss breach of contract claims be dismissed and holding that "one could interpret to the extent 'required' by the Secretary to refer to the minimum, which would be the outstanding balance of the loan"); *see also Ellsworth*, 908 F. Supp. 2d at 1085 (analyzing mortgage contract language which granted broader discretion to lenders than at issue here and holding that "[b]ecause the Court could not say that the contracts' terms unambiguously authorize Defendants' alleged behavior, the Court denies Defendants' motion to dismiss"); *McNeary-Calloway v. JP Morgan Chase Bank*, 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) (same).

This Court agrees with the reasoning of the panel majority in *Kolbe II* and the *Kolbe III* en banc court's "minority," and those district courts which have found similar allegations of breach of contract sufficient to withstand a motion to dismiss. As an initial matter, for the reasons discussed above, the Court is not persuaded by the reasoning of the *Kolbe III* "majority." Importantly in this regard, none of the evidence or arguments presented to that court by the United States and other amici are before this Court for consideration on Defendants' instant motion to dismiss. Moreover, the conflicting within the First Circuit itself, "makes plain that the provision is ambiguous, and its lack of clarity is underscored by the lack of consensus in the decisions of other courts." *Kolbe III*,

2013 WL 5394192, at *19 (collecting cases).  Indeed, this Court can conceive of no better demonstration that contract language is reasonably susceptible to more than one interpretation than an evenly divided en banc panel.  Thus, it is impossible for this Court to say, at this point in the litigation, that the contract is unambiguous and thus dismissal is warranted as a matter of law.  Accordingly, the HSBC Defendants' motion to dismiss on this basis is denied.

### ii.      *Plaintiffs' Kickback Claims*

The HSBC Defendants do not make any arguments specific to dismissal of Plaintiffs' breach of contract claims based upon the kickback theory.  Nevertheless, the Court construes the motion to dismiss Plaintiffs' breach of contract claims to extend to the kickback allegations and finds that Plaintiff have sufficiently pled a claim for breach of contract based upon their kickback allegations.

The Court is aware that some courts have found that other plaintiffs failed to adequately plead their kickback claims.  *See, e.g.*, *McKenzie*, 2012 WL 5372120, at *19 (granting motion to dismiss without prejudice as to kickback claims because "the allegations in Plaintiffs' SAC regarding Defendants' alleged scheme consist of only the bare conclusory factual allegations that Defendants received kickbacks and unearned commissions from force-placing and backdating excessively priced insurance"); *LaCroix*, 2012 WL 2357602, at *6 (dismissing kickback claims based upon a finding that "[a]lleging that nonparty ASIC has engaged in kickback schemes with other lenders, without specific facts regarding LaCroix's insurance policy or U.S. Bank's protocol regarding forceplaced insurance, is purely speculative and not sufficient to state a claim for relief").

Plaintiffs here, unlike the plaintiffs in *McKenzie* and *LaCroix*, have made specific, factually-detailed allegations regarding kickbacks received by The HSBC Defendantson force-placed flood insurance policies. *See* Compl. ¶¶ 48-66. These allegations are based on information discovered in similar cases being litigated around the country, investigations by the NYSDFS, Defendants' public filings, and reports published by insurance industry regulators. Plaintiffs have thus "provided ample and reliable evidence not only of an industry-wide practice but also that ASIC in particular pays kickbacks to lenders who force-place its flood insurance." *Ellsworth*, 908 F. Supp. 2d at 1084; *see also Leghorn*, 2013 WL 3064548 (following *Ellsworth* and concluding that mortgage contract "did not unambiguously authorize kickbacks"); *McNeary-Calloway*, 863 F. Supp. 2d at 955-56 (denying Defendants' motion to dismiss "[b]ecause the Court cannot say that the contracts' terms unambiguously authorize Defendants' alleged behavior" including kickback allegations; *Lane v. Wells Fargo Bank*, No. C 12-04026, 2013 WL 269133, *10 (N.D. Cal. Jan. 24, 2013) (finding "that plaintiffs have sufficiently stated a claim for breach of contract or breach of the implied covenant of good faith and fair dealing with respect to the kickback allegations"). Accordingly, the HSBC Defendants' motion to dismiss Plaintiffs' breach of contract and implied covenant of good faith and fair dealing claims based upon a kickback theory is denied.

### c.    Mincel's Breach of Contract Claims

The HSBC Defendants argue that Plaintiff Mincel's breach of contract claim fails because he has not alleged which provisions of the contract were breached. This is not surprising, Defendants contend, "because the terms of the mortgage explicitly warned Mincel that 'the cost of LPI might significantly exceed the cost of insurance that borrower could have obtained.'" Dkt. No. 35-10 at 17 (quoting Compl., Ex. 7 at 7). In response, Mincel argues that the HSBC Defendants breached his mortgage agreement by backdating force-placed flood insurance and by receiving

32

financial benefits (kickbacks). Such conduct constitutes a breach of Paragraph 5 of Mincel's mortgage agreement, he contends, "because the term 'required' necessarily limited HSBC's discretion to impose abusive terms upon Mincel." Dkt. No. 39 at 19. On reply, Defendants note that Mincel's arguments in opposition, including his citation to Paragraph 5, are not adequately pled in the Complaint. *See* Dkt. No. 46 at 7-8.

With respect to Plaintiffs' kickback allegations, the Court has already found them sufficient to withstand a motion to dismiss. Thus, Defendants' motion to dismiss Mincel's breach of contract claim on this basis is denied. However, Mincel's allegations with respect to backdating and the extent of HSBC's authority to force-place flood insurance under the mortgage contract is insufficiently pled. The Court notes that the arguments raised in Mincel's brief in opposition are strained and unsupported by the allegations in the Complaint.

Although Plaintiff has not requested leave to replead, the Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Nonetheless, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). Thus, "a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint that a valid claim might be stated." *Perri v. Bloomberg*, No. 11–CV–2646, 2012 WL 3307013,*4 (E.D.N.Y. Aug. 13, 2012) (citing *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).

It is clear that permitting amendment at this stage of the litigation would not be futile. Defendants argue that Mincel's failure to specifically cite to or quote from Paragraph 5 of his mortgage agreement in the Complaint is fatal to this claim. This is a defect which can easily be remedied. Moreover, assuming that Mincel is able to plead sufficient facts regarding Defendants' backdating practices generally, and as they pertain to him specifically, such claims have survived a motion to dismiss in similar cases. *See, e.g.*, *Leghorn*, 2013 WL 3064548, at *23-24 (collecting cases and denying defendants' motion to dismiss backdating claims). Thus, the Court will allow Mincel an opportunity to amend the Complaint with respect to this claim. Accordingly, Mincel's breach of contract claim and any other claims based upon the backdating theory are dismissed with leave to replead.

### d. The Implied Covenant of Good Faith and Fair Dealing Claims

In addition to a contract's express terms, New York law also recognizes an implied covenant of good faith and fair dealing in every contract.

> Encompassed within the implied obligation of each promisor to exercise good faith are "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included[.]'" (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 69, quoting 5 Williston, Contracts § 1293, at 3682 [rev ed 1937]). This embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" (*Kirke La Shelle Co. v Armstrong Co.*, 263 NY 79, 87). Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion (*see*, *Tedeschi v Wagner Coll.*, 49 NY2d 652, 659). The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that "would be inconsistent with other terms of the contractual relationship[.]" (*Murphy v American Home Prods. Corp.*, 58 NY2d 293, 304).

*Dalton v. Educ. Testing Serv.*, 87 N.Y. 2d 284 (1995).

The HSBC Defendants seek dismissal of Plaintiffs' implied covenant of good faith and fair dealing claims because, they contend, the express terms of the mortgage agreements govern the parties' relationships. Since the implied covenant cannot impose obligations that conflict with the express terms of the mortgage agreements, which unambiguously allows the HSBC Defendants discretion to force-place insurance on Plaintiffs' properties in any amount they require, there can be no breach of the implied covenant.

Plaintiffs allege that the HSBC Defendants improperly exercised their purported discretion to force-place flood insurance under excessive coverage, kickback, and backdating theories. The implied covenant claims based on the excessive coverage theory cannot be dismissed for the reasons urged by Defendants because the Court has already found the Hoovers' mortgage contract to be ambiguous as to HSBC's authority to require flood insurance in an amount greater than federal minimums. Moreover, the Court cannot conclude as a matter of law that the mortgage contracts provide the HSBC Defendants with unfettered discretion to act capriciously and in bad faith, including the alleged kickback scheme. Whether Defendants' actions were reasonable is a question of fact. Following those courts that have found similarly situated plaintiffs to have stated a claim for breach of the implied covenant, this Court concludes that the same reasoning applies to this case. *See, e.g.*, *Lass v. Bank of Am.*, 695 F.3d 129, 138 (1st Cir. 2012) (finding allegations of breach of implied covenant sufficient because "[i]f the Bank demanded flood insurance coverage that exceeded the requirements of federal law and the mortgage for the purpose of increasing profits for itself or its affiliates, or if it unjustifiably charged borrowers for backdated coverage and commissions, its conduct would be at odds with the intended and agreed expectations of the contract") (internal quotation and citation omitted); *Leghorn*, 2013 WL 3064548, at *25 ("[T]he Plaintiffs here have stated a claim under the implied covenant that Defendants abused this

discretion by acting in bad faith and outside the reasonable expectations of the parties. Whether Defendants' acts were done in bad faith and not within the reasonable expectations of the parties is a question of fact that cannot be decided at the pleading stage.") (citations omitted); *Karp v. Bank of Am.*, No. 8:12-cv-1700-T-17MAP, 2013 WL 1121256, *4 (M.D. Fla. Mar. 18, 2013) ("Where, as here, the implied covenant would not vary the express terms of the Mortgage, a failure to perform such discretionary duties in good faith could constitute a breach of the implied covenant of good faith and fair dealing."); *Casey*, 915 F. Supp. 2d at 264 ("[p]laintiffs sufficiently allege that defendants exhibited bad faith by force-placing unnecessary or excessive flood insurance—either without the contractual authority to require such insurance or as an arbitrary or irrational exercise of their discretion to do so—and by taking commissions and/or kickbacks related to the force-placed insurance"); *Ellsworth*, 908 F. Supp. 2d at 1063 (finding the plaintiffs' implied covenant allegations sufficiently pled); *Kunzelmann*, 2012 WL 2003337, at *5 (denying motion to dismiss based upon allegation that the "Defendants breach[ed] their implied duty of good faith and fair dealing by, among other things, choosing an insurance policy in bad faith and in contravention of the parties' reasonable expectations, failing to seek competitive bids for the insurance policies, and selecting insurance companies that would pay unearned kickbacks to Defendants"); *McNeary-Calloway*, 863 F. Supp. 2d at 958 ("Although Defendants have the right to set the scope and extent of hazard insurance coverage—and explicitly warn that FPI may be "significantly" more expensive than coverage on the open market—the Plaintiffs here have stated a claim under the implied covenant that Defendants abused this discretion by acting in bad faith and outside the reasonable expectations of the parties."); *Skansgaard*, 896 F. Supp. 2d at 944 (holding that the plaintiff had sufficient alleged a breach of the implied covenant because the defendants' unilateral decision to require more insurance than was required by the deed of trust deprived the plaintiff of

the full benefit of the bargain).   Accordingly, the HSBC Defendants' motion to dismiss the implied covenant claims is denied.[3]

### 4.    Unjust Enrichment

All Defendants argue that Plaintiffs' unjust enrichment claims fail as a matter of law because under New York law unjust enrichment claims are prohibited where the relationship between the parties is governed by an express contract.  Dkt. No. 35-10 at 18-19; Dkt. No. 34-1 at 21-22.

"Generally, to state a claim for unjust enrichment, plaintiffs must allege that defendants benefitted at plaintiffs' expense and 'that equity and good conscience require restitution.'"  *Casey*, 915 F. Supp. 2d at 264 (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, Inc.*, 448 F.3d 573, 586 (2d Cir.2006)).  "New York . . . case law indicate[s] that an unjust enrichment claim cannot be sustained if a valid contract governs the relevant subject matter of the dispute, even against a non-signatory to the contract."  *Id.* (citing *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009)).

This litigation is in federal court and is therefore governed by the Federal Rules of Civil Procedure, which expressly permits alternative pleading at this stage of the litigation.  "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d).  Thus, "at this early stage of the litigation, it is reasonable to permit plaintiffs to plead unjust enrichment claims in the alternative to their breach of contract claims."  *Casey*, 915 F. Supp. 2d at 265 (citation omitted); *see also Lass*,

---

[3]  As discussed above, the Court has already found the allegations regarding the backdating theory to be insufficiently pled.

695 F.3d at 140 ("[a]lthough the Bank is correct that damages for breach of contract and unjust enrichment are mutually exclusive, it is accepted practice to pursue both theories at the pleading stage") (citations omitted); *Simpkins*, 2013 WL 4510166, at *7 (rejecting same argument interposed by Defendants here because "'[a] federal court sitting in diversity applies federal pleading requirements even when the claim pleaded arises under state rather than federal law'") (citation omitted).

In addition, this argument fails as to the Assurant Defendants, since they were not parties to the mortgage contracts at issue, nor did the contracts unambiguously authorize the wrongful force-placement of insurance by the Assurant Defendants. Thus, the Assurant Defendants cannot benefit from the argument that an express contract governs the relationship. *See, e.g.*, *Williams v. Wells Fargo Bank*, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011) (rejecting the defendant's argument that the existence of a contract precluded the plaintiff's unjust enrichment claim where that defendant asserted that it was not a party to the mortgage contract at issue).

The Assurant Defendants separately argue that any benefit they received was from the HSBC Defendants and not a sufficiently "specific and direct benefit" from Plaintiffs. Dkt. No. 34-1 at 19-20. "New York law does not require an unjust enrichment plaintiff to plead 'direct dealing,' or an 'actual, substantive relationship' with the defendant. It merely requires that the plaintiff's relationship with a defendant not be 'too attenuated.'" *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010). Contrary to the Assurant Defendants' assertion, Plaintiffs have alleged, sufficient to survive a motion to dismiss, an unjust enrichment claim, notwithstanding the purportedly "indirect" benefit. *See Casey*, 915 F. Supp. 2d at 265 (finding similar argument "unpersuasive as Casey alleges FirstInsure received a commission from the flood insurance MidFirst force-placed on his property. Thus, albeit indirectly, FirstInsure received a

benefit from Casey's escrow funds or increased indebtedness"); *Morris*, 2012 WL 3929805, at *10 (finding similar allegations sufficient under Pennsylvania law to create a showing "that there was a conferral of a benefit despite the fact that the funds were not paid to [the insurer] directly"); *Williams*, 2011 WL 4368980, at *9 (concluding that, under Florida law, "the mere fact that there has been no direct contact between a defendant and the plaintiff does not preclude a finding that the defendant received a direct benefit from that plaintiff").

Last, the Assurant Defendants separately argue that there is nothing "unjust" about their conduct or their retention of force-placed floor insurance premiums because the mortgage contracts allow for the force-placement of insurance. *See* Dkt. No. 34-1 at 23-26. This arguments goes to the ultimate merits of the case – that is, whether the conduct alleged by Plaintiffs is wrongful – and is not an appropriate basis for dismissal at this stage of the litigation. In sum, drawing all reasonable inferences in favor of Plaintiffs, the Court finds the allegations sufficient to raise a claim for unjust enrichment, and Defendants' motions to dismiss Plaintiffs' unjust enrichment claims are denied.

### 5. Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

Plaintiffs allege that the HSBC Defendants accepted funds from Plaintiffs for flood insurance premiums and held them in escrow, pursuant to their respective mortgage agreements. "HSBC was obligated to hold these escrow funds in trust and owed Plaintiffs a fiduciary duty with respect to the handling of such funds." Compl. ¶ 110. By engaging in bad faith conduct – *i.e.*, requiring excessive coverage and engaging in a kickback scheme – the HSBC Defendants breached their fiduciary duty to Plaintiffs. The HSBC Defendants argue that Plaintiffs' breach of fiduciary duty claims should be dismissed because they do not owe Plaintiffs a fiduciary duty. *See* Dkt. No. 35-10 at 19-20.

As a general proposition, New York law provides that there is no fiduciary duty between creditors and debtors, absent exceptional circumstances:

> The "legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors." *Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299 (1st Dep't 1992), lv. denied 80 N.Y.2d 754, 587 N.Y.S.2d 906, 600 N.E.2d 633 (1992). To be sure, a fiduciary relationship may arise even between a bank and a customer if there is either "a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding[,]" *Manufacturers Hanover Trust v. Yanakas*, 7 F.3d 310, 318 (2d Cir.1993), *motion to vacate denied*, 11 F.3d 381 (1993)[,] or an assumption of control and responsibility. *Gordon v. Bialystoker Center & Bikur Cholim*, 45 N.Y.2d 692, 412 N.Y.S.2d 593, 385 N.E.2d 285 (1978). However, the complaint does not allege facts indicating that Mellon's actions were designed to instill a special relationship apart from the ordinary debtor/creditor relationship. Moreover, plaintiffs' attempt to create a fiduciary duty based upon the existence of an escrow account is unpersuasive. Plaintiffs do not allege that Mellon in any way misused the funds placed into escrow for payment over to Gemico. *Cf.*, *Davis v. Dime Savings Bank of New York*, 158 A.D.2d 50, 557 N.Y.S.2d 775 (3d Dep't 1990) (allegations of fraud in connection with escrow arrangement for the payment of taxes).

*Bauer v. Mellon Mortgage Co.*, 680 N.Y.S. 2d 397, 401-02 (N.Y. Sup. Ct. 1998).

However, Plaintiffs have pled this claim in conclusory fashion, with insufficient factual allegations upon which the Court can examine the relationship between the parties. *See* Compl. ¶¶ 106-113. Thus, the Court is unable to determine, upon a fair reading of the Complaint, whether there was "confidence reposed" or "an assumption of control and responsibility." For this reason, the Court concludes that Plaintiffs have failed to allege a plausible breach of fiduciary duty claim. *See Lane*, 2013 WL 269133, at *11 (granting the defendants' motion to dismiss breach of fiduciary duty claims because the plaintiffs' conclusory allegations were insufficient to establish the existence of a fiduciary duty and "Plaintiffs cite[d] no authority in support of their position that the

40

mere maintenance of an escrow account for the payment of routine fees and expenses creates a fiduciary duty and gives rise to a relationship that is 'more than a debtor-creditor relationship' under Arkansas law"); *Gustafson*, 2012 WL 7051318 (dismissing California and Illinois state law breach of fiduciary duty claims for failure to allege existence of fiduciary duty with respect to mortgage escrow account); *McKenzie*, 2012 WL 5372120, at *22 (finding under Texas and New Mexico law that "mere payment of funds by the mortgagor into an escrow account for the mortgagee's use to meet tax and insurance obligations on the property as they accrue does not create a trust or fiduciary relationship"); *Morris*, 2012 WL 3929805, at *10 (holding under Pennsylvania law that averments that defendants held funds in escrow for payment of insurance premiums pursuant to a standard escrow provision fell short of creating a fiduciary relationship); *Gorham-DiMaggio v. Countrywide Home Loans*, 592 F. Supp. 2d 283 (N.D.N.Y. 2008) (dismissing breach of fiduciary duty claim under New York state law because the "Plaintiff provide[d] no basis or support for this fiduciary duty to provide escrow information, and the Court is unable to find any. Plaintiff has not established that there was either 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility'") (citations omitted). Thus, the HSBC Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty claim is granted.

However, such dismissal is granted without prejudice because the Court recognizes that under New York state law, Plaintiffs may be able to plead and prove the existence of a fiduciary relationship in the context of an escrow account. "New York case law recognizes a fiduciary duty where specific language in the contract obligates a creditor to make payments out of an escrow account on behalf of the debtor." *Casey*, 915 F. Supp. 2d at 265; *see also Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396 (E.D.N.Y. 2013) (denying the defendant's motion to summary

judgment on breach of fiduciary duty claim and finding that contractual language which obligated mortgagee to make specified payments from escrow funds gave rise to a fiduciary duty); *Heller v. First Town Mortgage Corp.*, No. 97 Civ. 8575, 1998 WL 614197, *9 (S.D.N.Y. Sept. 14, 1998) ("An escrow agent becomes a trustee for both parties after the escrow agent receives funds in connection with the escrow arrangement. As a trustee for the plaintiff's funds held in escrow, the defendant stood in a fiduciary relationship with the plaintiff. If [defendant] First Town required that the plaintiff pay more into an account than the contract or federal law permitted, and if on top of that First Town got to keep the interest on this extra money, then First Town breached its fiduciary duty to the plaintiff.") (citations omitted); *Standard Federal Bank v. Healy*, 7 A.D.3d 610, 612 (2d Dept. 2004) (holding that "[a]lthough the relationship between a borrower and a bank is a contractual one which generally does not give rise to a fiduciary duty, a bank, in its capacity as escrow holder of funds to be used for the payment of property taxes, may be held liable on a theory of breach of fiduciary duty for the failure to make required tax payments") (internal citations omitted); *cf. Simpkins*, 2013 WL 4510166, at *8 (finding allegations in force-placed insurance litigation of breach of fiduciary duty under Illinois law based on an agency relationship sufficient to withstand a motion to dismiss). Accordingly, the Court will allow Plaintiffs to replead their breach of fiduciary duty claims.

The Assurant Defendants argue that the aiding and abetting breach of fiduciary duty claim should be dismissed because the HSBC Defendants did not owe Plaintiffs a fiduciary duty, the Assurant Defendants were unaware of any purported fiduciary duty, and the fiduciary duty claims duplicate the contract-based claims. Dkt. No. 34-1 at 27-30. Since the Court has granted the HSBC Defendants motion to dismiss Plaintiffs' breach of fiduciary duty claim for failure to adequately allege the existence of a fiduciary duty, the aiding and abetting breach of fiduciary duty

claim is likewise dismissed without prejudice. *See Gustafson*, 2012 WL 7071469, at *7 ("Without a principal who has breached a fiduciary duty, Plaintiffs have failed to allege a claim for aiding and abetting a breach of fiduciary duty.").  Accordingly, the Court need not reach Assurant's latter two arguments.

### 6.    Conversion

The HSBC Defendants argue, as they do with respect to the unjust enrichment claims, that Plaintiffs' conversion claims should be dismissed because they are redundant of the breach of contract claims.  *See* Dkt. No. 35-10 at 20-21.  As discussed in the Unjust Enrichment section above, at this stage of the litigation alternative pleading is permissible under the Federal Rules. Accordingly, the HSBC Defendants' motion to dismiss Plaintiffs' conversion claims is denied.

### 7.    New York Deceptive Practices Act

The HSBC Defendants argue that because their practices were authorized by the terms of their mortgages and disclosed to Plaintiffs, the NYDPA claims fail as a matter of law because such practices were not misleading.  Dkt. No. 35-10 at 21-23.

The NYDPA prohibits all "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. G.B.L. § 349(a).  "To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  The allegedly deceptive act is objectively defined as an act "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (quotations omitted).

With respect to the Hoovers' claims based upon the excessive coverage theory, the Court has found the Hoovers' mortgage contract language to be ambiguous.  Thus, it cannot be said at

this stage of the litigation that, as a matter of law, HSBC's practices were authorized and therefore not misleading. As to the kickback theory, the HSBC Defendants do not contend that the system of kickbacks and commissions alleged by Plaintiffs was authorized or disclosed to Plaintiffs. Thus, the conduct alleged by Plaintiffs is likely to mislead a reasonable consumer as to the amounts of flood insurance coverage required, as well as the appropriateness of the HSBC Defendants' process of selecting and exchanging financial benefits with a force-placed insurance provider. *See Casey*, 915 F. Supp. 2d at 265-66; *Simpkins*, 2013 WL 4510166 , at *13. Accordingly, the HSBC Defendants' motion to dismiss this claim is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions to dismiss are **GRANTED in part** and **DENIED in part** in accordance with this Memorandum-Decision and Order; and the Court further

**ORDERS** that Plaintiff Mincel's breach of contract claim (Count 1) and all claims based upon a backdating theory are **DISMISSED without prejudice**; and the Court further

**ORDERS** that Plaintiffs' breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims (Counts 3 and 4) are **DISMISSED without prejudice**; and the Court further

**ORDERS** that Defendant Assurant's motion to dismiss for lack of subject matter jurisdiction is **DENIED without prejudice** to renew following jurisdictional discovery; and the Court further

**ORDERS** that Defendants' motions to dismiss are **DENIED** in all other respects; and the Court further

**ORDERS** that Plaintiffs are granted leave to file an amended complaint to address the matters discussed in this Memorandum-Decision and Order within 21 days, and any motions to dismiss Plaintiffs' amended complaint shall be filed within 21 days of the filing of amended complaint; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

Dated:  March 27, 2014
　　　　Albany, New York

Mae A. D'Agostino
U.S. District Judge